UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


NEW HAMPSHIRE INDEMNITY
COMPANY,

     Plaintiff,

v.                               CASE NO: 8:11-cv-943-T-23MAP

DAVID D. SCOTT, DANIEL
C. SCOTT, and RICHARD
OULETTE, as guardian of Sarah
Hester Edwards,

     Defendants.

_____/


**ORDER**

    David Scott (Scott) financed his two-hundred-dollar-per-day drug habit by

larceny, including by robbery.  On October 22, 2005, Mrs. Sarah Edwards, while on a

routine shopping trip, walked alone across a grocery store parking lot toward her car

and with her purse casually strapped around her shoulder.  After watching from

nearby, Scott drove his father's 2002, two-ton, GMC Sierra 1500 pick-up truck

toward Sarah, slowed as he pulled the truck next to her, reached through the truck's

window, grabbed Sarah's purse securely, and forcefully pulled the purse, which clung

to Sarah's shoulder.  Beginning his getaway, Scott accelerated the truck.  Still clinging

to the purse, Sarah was forced by Scott's continued pulling to slam into truck and

onto the pavement.  Scott's opportunistic and forceful attack traumatically and

permanently injured Sarah's brain.  Sarah survives in a severely impaired, semi-vegetative state.

Scott's insurer sues Sarah's guardian and Scott, seeks a judgment declaring the absence of a duty to defend or indemnify, and moves (Doc. 36) for summary judgment.  Sarah's guardian submits a response (Doc. 47), which Scott joins (Doc. 50).  Sarah's guardian moves (Doc. 37) for summary judgment; Scott moves (Doc. 44) for summary judgment.  The insurer responds (Docs. 48 & 49).

## BACKGROUND

A New Hampshire Indemnity Company ("NHIC") automobile insurance policy owned by Scott's father, Daniel Scott, insures the pick-up truck and lists Scott as an insured driver.  In pertinent part, the policy states:

> **INSURING AGREEMENT**
>
> A.  We will pay damages for "bodily injury" or "property damage" for which any "insured" becomes legally responsible because of an auto accident.
>
> . . .
>
> **EXCLUSIONS**
>
> A.  We do not provide Liability Coverage for any "insured":
>
> > 1.  Who intentionally causes "bodily injury" or "property damage".

(Doc. 1 at 15)  The policy includes no explicit definition of "auto accident."

On November 10, 2005, Scott pleaded guilty both to robbery in violation of Sections 812.13(1) and 812.13(2)(c), Florida Statutes, and to felony battery in

- 2 -

violation of Section 784.041, Florida Statutes.  In September, 2008, Sarah's guardian sued the owner of the shopping center for failure to provide adequate security.  In a prison interview, conducted by the guardian's counsel on September 18, 2009, Scott denied the intent to harm Sarah and stated that he wanted only to steal money to buy drugs.  Six days later and under oath, Scott repeated the denial to counsel for the shopping center's owner.[1]  Sarah settled with the owner of the shopping center.

On October 2, 2009, nearly four years after the robbery, Scott's mother reported the robbery to NHIC and advised that the guardian's counsel had contacted Scott in prison.  On October 7, 2009, NHIC sent Scott's father a "reservation-of-rights letter" under Section 627.426, Florida Statutes.  In pertinent part, the letter states that "the loss was not reported in a timely manner," that "the investigation of this loss is being handled under a full Reservation of Rights by [NHIC]," and that NHIC reserves "all its rights and defenses under the said policy of insurance as fully and completely as if [NHIC] had refused to take any steps whatsoever in the investigation as set out above."  (Doc. 1 at 47).  A week later, on October 16, 2009, Sarah's guardian sued Scott and his father for negligence and negligent entrustment.  *Oulette v. Scott*, No. 09-

---

[1] Scott's innocent insistence that he lacked the intent to injure Sarah Edwards co-exists most uncomfortably, if not irreconcilably, with the fact that five days before his attack on Sarah he similarly attacked 84-year-old Melba Williams by approaching her in his father's truck, reaching out through the truck's window to grab for her purse, pulling her to the ground, and injuring her as a result.  (Similarly, in addition to injuring Melba Williams, Scott drove his father's truck alongside a third victim and snatched her purse but no injury resulted.)  Scott testified that his addiction rendered him oblivious to impediments to acquiring drugs and that nothing would deter his daily pursuit of money to buy drugs.  Scott's claim to lack the intent to injure, despite his confirming his willingness to injure and despite his knowledge of injury (or his disinterest in injury) during his earlier robbery, suggests his claim to lack intent to injure more nearly resembles an expression of casual (or forlorn) hope that the predictable injury would not occur.

CA-26329 (Fla. 13th Cir. Ct.) (the "underlying action").  NHIC defended Scott and

his father under the reservation of rights.

On November 17, 2010, NHIC sent another "reservation-of-rights letter."

(Doc. 37-14)  The letter continues the "full Reservation of Rights," and asserts that

the policy's intentional injury provision also excludes coverage.  Because the

November 17 letter "mistakenly quoted" the policy, NHIC sent an amended

"reservation-of-rights letter" on March 7, 2011.  (Doc. 1 at 51)  None of the three

letters expressly reserves the right to seek from Scott reimbursement of his defense

costs.  On April 27, 2011, NHIC settled Scott's father's liability for $10,000 – the

policy limit.  On April 29, 2011, the Friday before the week of the *Oulette v. Scott* trial,

NHIC brought this action for a judgment declaring the absence of a duty to defend or

indemnify Scott and Scott's father.  On May 10, 2011, the *Oulette v. Scott* jury

(1) returned a verdict for more than $73 million in compensatory damages and

(2) answered "Yes" to whether "the negligence of David Scott cause[d] Sarah

Edwards to suffer a permanent injury within a reasonable degree of medical

probability[.]"  (Doc. 37-19)  Judgment was entered against Scott for $69,512,505.90.

## DISCUSSION

Scott admits the intent to rob Sarah Edwards but denies the "specific intent" to

cause bodily harm.  Scott argues that this claimed absence of specific intent to injure

compels a finding of coverage.  The dispositive issue is whether NHIC's policy,

which covers "an auto accident" but excludes coverage for "any insured who

intentionally causes bodily injury," requires NHIC to indemnify Scott for damages arising from his forceful and felonious infliction of permanent brain damage on Sarah Edwards.[2] Precedent, plain language, public policy, and prudence compel a negative answer.

Governed by the objective intent of the parties, "[t]he interpretation of an insurance contract is a question of law." *Kattourn v. N.H. Indem.*, 968 So. 2d 602, 604 (Fla. 2d DCA 2007); *see also Suyvesant Ins. v. Butler*, 314 So. 2d 567, 570 (Fla. 1975); *Rigel v. Nat'l Cas.*, 76 So. 2d 285, 286 (Fla. 1954). Thus, "[i]f the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written." *Travelers Indem. v. PCR, Inc.*, 889 So. 2d 779, 785 (Fla. 2004) (citing *Swire Pac. Holdings v. Zurich Ins.*, 845 So. 2d 161, 165 (Fla. 2003)). Ambiguity arises only if "the language 'is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage.'" *PCR*, 889 So. 2d at 785 (quoting *Swire*, 845 So. 2d at 165). Ambiguity favors the insured and commends a reasonable interpretation providing coverage. *PCR*, 889 So. 2d at 785. However,

---

[2] An insurer's duty to defend is prompted by the allegations against the insured, and a duty to indemnify arises only upon a determination of coverage. *McCreary v. Fla. Residential Property and Cas. Joint Underwriting*, 758 So. 2d 692, 695 (Fla. 4th DCA 1999). The complaint in the underlying action alleges that Scott was "negligent . . . by operating the [] motor vehicle as a means to commit a robbery by sudden snatching" (Doc. 1 at 42) and that Scott's actions "were not intended to harm Sarah." As explained in detail below, the allegation of Scott's "negligence" and the allegation of Scott's "robbery by sudden snatching" conflict irreconcilably under any reasonable interpretation of the law. No party disputes that, if the underlying complaint alleges an intentional tort ("operating [a] motor vehicle as a means to commit robbery by sudden snatching"), the claim's negligence label should be disregarded. *See Cabezas v. Fla. Farm Bureau Cas. Ins.*, 830 So. 2d 156, 158 (Fla. 3d DCA 2002); *Aetna Cas. & Sur. v. Miller*, 550 So. 2d 29 (Fla. 3d DCA 1989).

absent ambiguity, plain meaning prevails. *Liebel v. Nationwide Ins. Co. of Fla.*, 22

So. 3d 111 (Fla. 4th DCA 2009), *rev. dismissed*, 32 So. 3d 622 (Fla. 2010); *Auto Owners*

*Ins. v. Above All Roofing*, 924 So. 2d 842 (Fla. 2d DCA 2006). A coverage clause and

an exclusionary clause are construed together, *State Farm Fire & Cas. v. CTC*

*Development*, 720 So. 2d 1072, 1074-75 (Fla. 1998), and an exclusionary clause creates

no coverage. *LaMarche v. Shelby Mut. Ins.*, 390 So. 2d 325, 326 (Fla. 1980).

> The terms of an insurance policy should be taken and understood in their ordinary sense, and like other contracts, should receive a construction that is reasonable, practicable, sensible, and just, consistent with the intent of the parties, not a strained, forced or unrealistic interpretation. Insurance policies will not be construed to reach an absurd result.

30B Fla. Jur. 2d *Insurance* § 1589 (2012) (internal citations omitted).

Considerations of whether a liability policy excludes coverage for an assault

and battery include:

> (1) the terms of the contract; (2) the basic coverage requirements of an "accident" or "occurrence"; (3) any specific exclusions that arguably encompass assault; and (4) the public policy of the relevant jurisdiction. Generally liability insurance policies have been interpreted as not providing coverage for assaults committed by the insured based upon the public policy against indemnifying a person for their own wrongdoing. An assault is also commonly not covered under a policy of liability insurance when there is an intentional act exclusion which excludes coverage for injuries intentionally caused by the insured.

9 *Couch on Insurance* § 127:20 (3d ed. 2011). Applied to a drive-by robbery and a

felony battery, the plain meaning of the unambiguous "auto accident" clause

prevails. *Black's Law Dictionary* 15-16 (8th ed. 2004) defines "accident" as "[a]n

unintended and unforeseen injurious occurrence; something that does not occur in

the usual course of events or that could not be reasonably anticipated" and "accidental" as "[n]ot having occurred as a result of anyone's purposeful act; esp., resulting from an event that could not have been prevented by human skill or reasonable foresight." *Webster's New Third International Dictionary* 11 (1981) defines (1) "accident" as "an event or condition occurring by chance or arising from unknown or remote causes"; "lack of intention or necessity:  chance – often opposed to design"; "an unforeseen unplanned event or condition"; and "a . . . sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result" and (2) "accidental" as "happening or ensuing without design, intent, or obvious motivation or through inattention or carelessness." *The American Heritage Dictionary of the English Language* 11 (3d ed. 1992) defines (1) "accident" as "an unexpected undesirable event"; "an unforseen incident"; "lack of intention" and (2) "accidental" as "occurring unexpectedly, unintentionally, or by chance."  Scott's predatory stalking and desperate injurious attack on Sarah was no "auto accident," at least under any rule of law that presumes words to possess and convey meaning and to effect consequences ascertainable with confidence by a reasonable and reasonably informed person.

Second, under the meaning of the policy, Scott caused the bodily injury intentionally.  NHIC cites *Bosson v. Uderitz*, 426 So. 2d 1301 (Fla. 2d DCA 1983), which involves a drive-by purse snatching in a mall parking lot.  The plaintiffs called

to an elderly woman, who approached the passenger side of the vehicle.  A plaintiff grabbed the woman's purse and pulled the purse into the car.  The woman grabbed the car's door handle as the plaintiffs accelerated, and the woman was injured. *Bosson* analyzes a clause that excludes coverage for "bodily injury or property damage caused intentionally by, or at the direction of, an insured person."  *Bosson* notes (1) that the "uncontroverted testimony . . . reveals that [the plaintiffs] intended to steal the purse by exerting whatever force was necessary," (2) that the conduct "amounted to a robbery and that it was, therefore, intentional," and (3) that "it matters not that [the woman] received her injuries when [the plaintiffs] drove away after the purse snatching."  *Bosson* cites *Hartford Fire Ins. v. Spreen*, 343 So. 2d 649 (Fla. 3d DCA 1977), and concludes, "At a minimum the acts amount to an assault . . . [;] they were intentional and not negligent."

*Spreen* involves an insured who punched a man in response to a verbal insult. The intentional punch caused unintentionally severe damage, including "a blow-out fracture of the orbital floor of the eye," which necessitated two eye surgeries and caused a loss of vision and other collateral injury.  In holding that the Hartford policy ("which provides coverage for damage[] caused by an 'accident' and excludes from coverage damage[] 'which [is] either expected or intended from the standpoint of the insured'") excludes the battery, *Spreen* notes that "there can be no coverage under an insurance policy [that] insures against an 'accident' where 'the (insured's) wrongful act complained of is intentionally directed specifically toward the person injured by

- 8 -

such act.'"  343 So. 2d at 652 (quoting *Grange Mutual*, 301 So. 2d at 159).  Although

the insured specifically intended to cause harm (but not such extensive harm), *Spreen*,

like *Bosson*, supports the unremarkable and controlling proposition that the term

"accident" in an insurance policy excludes the insured's intentional torts, such as an

assault and a battery, directed specifically toward the person injured.  *See, e.g.*, *Prasad*

*v. Allstate Ins.*, 644 So. 2d 992 (Fla. 1994); *Stepp v. State Farm Fire & Cas.*, 656 So. 2d

494 (1st DCA 1995); *State Farm Fire & Cas. v. Caldwell*, 630 So. 2d 668 (Fla. 4th DCA

1994); *Aetna Cas. & Sur. v. Miller*, 550 So. 2d 29 (Fla. 3d DCA 1989); *Capoferri v.*

*Allstate Ins.*, 322 So. 2d 625 (Fla. 3d DCA 1975); *Buchwald v. Hartford Acc. and Indem.*,

319 So. 2d 164 (Fla. 3d DCA 1975); *Grange Mutual Cas. v. Thomas*, 301 So. 2d 158

(Fla. 2d DCA 1974); *Consolidated Mut. Ins. v. Ivy Liquors*, 185 So. 2d 187 (Fla. 3d

DCA 1966); *Allstate Ins. v. Cruse*, 734 F. Supp. 1574 (M.D. Fla. 1989) (Fawsett, J.); *see*

*also Melrose Hotel v. St. Paul Fire & Marine Ins.*, 432 F. Supp. 2d 488, 506-07 (E.D. Pa.

2006); *Hereford Ins. v. Segal*, 40 A.D. 3d 816 (N.Y. App. 2007); Schermer & Schermer,

1 *Auto. Liability Ins.* § 4:2 (4th ed. 2012) ("Under the definition of accident, an assault

and battery is deemed an accident unless committed by or at the direction of the

insured.") (internal quotations omitted); 8A *Couch on Insurance* § 119:6 (3d ed. 2011)

(citing cases); *compare Leatherby Ins. Co. v. Willoughby*, 315 So. 2d 553 (2d DCA 1975).

Suppose that, in the grocery store parking lot, Scott's truck had suddenly and

unexpectedly accelerated and surged forward spontaneously as a result of a

mechanical defect and suppose that, say, the side-view mirror (rather than Scott's

hand) had randomly snagged Sarah's purse and inflicted the same injury by the same mechanism as Scott actually inflicted by his purposeful and directed attack.  A normal, sound, and unstrained application of English words, even legal words, would result in the quite similar but hypothetical event's qualifying as an "auto accident" that was not an "intentional injury" (even if Scott intended to rob her but was pre-empted by the sudden surge of his father's truck, which had served him well in his earlier robberies).  In this hypothetical episode, Scott's surging forward results not from Scott's volitional act but from an unknown and unexpected malfunction in the truck – that is, from an "accident."

In the actual case, Scott's attack on Sarah results from his predatory selection of her as the vulnerable and easy target of his desperate criminal plan.  Despite immense effort and laudably creative argument, neither Sarah's guardian's nor any other party's paper cites any precedent for the bizarre notion that a focused, directed criminal attack undertaken without heed of the consequences and directly and foreseeably resulting in a catastrophic, permanent, life-altering injury is a mere "accident" and was not "intentional."  Only a wholesale abandonment of the protocols of the English language would permit that transformation of the terms "accident" and "intentional."

Scott argues unpersuasively that two Supreme Court of Florida decisions overrule the entirety of Florida's pertinent  precedent and compel a new and surprising result.  *State Farm Fire & Cas. v. CTC Development*, 720 So. 2d 1072 (Fla.

1998), involves a builder who, under a mistaken belief that the local government had permitted a variance from a setback line, constructed a residence beyond the setback line. The neighbor sued the builder, the insurer refused to defend the builder, and the builder sued the insurer for a declaratory judgment. The policy prescribes coverage for:

> [T]hose sums that the insured becomes legally obligated to pay as damages because of bodily injury, property damage, personal injury or advertising injury to which this insurance applies . . . . This insurance applies only[] to bodily injury or property damage caused by an occurrence which takes place in the coverage territory during the policy period.

The policy defined "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions which result in bodily injury or property damage." The policy excluded "bodily injury or property damage expected or intended from the standpoint of the insured; or [] any person or property which is the result of willful and malicious acts of the insured."

The Florida Supreme Court broadly framed the issue as "whether the term 'accident' in a liability policy, which term is not otherwise defined, should be defined to include not only 'accidental events,' but also injuries or damages that are neither expected nor intended from the standpoint of the insured.'" Finding coverage, *CTC Development* held that "where the term 'accident' in a liability policy is not defined, the term, being susceptible to varying interpretations, encompasses not only 'accidental events,' but also injuries or damage neither expected nor intended from the standpoint of the insured.'" *CTC Development* concluded:

> Viewing the facts most favorably to the insured, [the builder] did not
> expect or intend for damages to result from his act of constructing
> the home.  He did not openly defy the setback requirements; he
> mistakenly believed that he had received a variance for the
> construction.  Therefore, the fact that he intentionally constructed
> the house knowing that it was outside of the setback line does not
> preclude a finding of coverage under his liability policy for this
> "occurrence."

720 So. 2d at 1076.  Under any reasoned interpretation, *CTC Development* fails to

convert an intentional criminal attack and the resulting catastrophic injury into an

"accident" that was not "intended."

In *Travelers Indemnity v. PCR, Inc.*, 889 So. 2d 779 (Fla. 2004), an explosion at a

chemical plant killed and seriously injured employees.  A dissent provided the

pertinent facts:

> At the time of the explosion on November 22, 1991, PCR was
> combining the chemicals "tetrafluoroethylene (TFE) with
> hexafluoropropene (HFP), in the presence of aluminum chloride" to
> create F–pentene–2, a replacement for the coolant, Freon 113.  PCR
> was aware that TFE is an extremely dangerous chemical, for "ICI,
> the company that manufactures TFE, notified PCR in April 1991,
> that it was planning to discontinue supplying TFE throughout the
> United States because of its hazardous character."  "TFE's explosive
> force is equal to two-thirds that of TNT, and the risk of an explosion
> by using TFE in the production of F–pentene–2 is very high."  The
> risk was so high, in fact, that there was "evidence of 'at least three'
> other uncontrolled explosions at PCR in just under two years."

889 So. 2d at 800 (Quince, J., dissenting) (emphasis and internal citations omitted)

The governing policy included a clause providing coverage for "bodily injury by

accident . . . aris[ing] out of and in the course of the injured employee's employment

by [the employer]," and excluding coverage for "bodily injury intentionally caused or

aggravated by [the employer]."  Thus, *PCR* decided (1) whether the policy extended

- 12 -

coverage to actions that are "objectively substantially certain" to result in injury even though the employer did not specifically intend to cause an injury and (2) whether public policy prohibited an employer from insuring against the liability for actions "objectively substantially certain" to result.

Extending the policy to cover the explosion, *PCR* notes that a policy cannot be construed "in a vacuum":

> This is not to say that we must interpret the insurance policy in a vacuum. This is a workers' compensation and employer's liability insurance policy, protecting an employer against the risk of both workers' compensation liability and tort liability, and, since it is such a policy, it would make little sense not to interpret it with reference to the circumstances under which the parties entered into the contractual agreement. But interpreting the policy language (particularly when that language, on its face, is ambiguous) with reference to the reasons which motivated the parties to make the contract is not the same as interpreting terms in the policy language identically to the way those terms have been interpreted in different contexts. This is especially so where, as here, such interpretations would actually undermine what was most likely the parties' intent in making the contract.

889 So. 2d at 788 n. 9. Also, *PCR* recedes from the purportedly all-purpose definition of "accident" announced in *CTC Development*:

> In any event, despite our statements to the contrary in *CTC Development*, it is not clear why the definition of "accident" employed there should apply here. The policy at issue there included an exclusionary clause materially different than the exclusionary clause in the present policy. In defining the term "accident" in the coverage clause, we looked to the scope of the exclusionary clause on the ground that all "pertinent provisions [of the policy] should be read *in pari materia*."

889 So. 2d at 791 n. 13.

Finding that public policy permits coverage for an explosion that was "substantially certain" but not intentional, *PCR* applies a test announced in *Ranger Ins. Co. v. Bal Harbour Club*, 549 So. 2d 1005 (Fla. 1989), which considers "whether the existence of insurance will directly stimulate commission of the wrongful act" and "whether the purpose served by the imposition of liability for certain conduct is to deter wrongdoers or compensate victims." *PCR*, 889 So. 2d at 794 (internal quotations omitted).  First, *PCR* explained that deliberate intent "squarely implicate[s] the rule that one should not be able to insure against one's own intentional misconduct . . . , [but] [w]here liability is not predicated on intent, . . . the rule is not implicated."  889 So. 2d at 794 (internal quotation omitted)  Second, *PCR* reasons that "employer conduct that was objectively substantially certain to cause injury, even though the employer neither intended nor actually expected that its conduct would cause injury, is distinguishable from an act of [*Bal Harbor's*] intentional discrimination."  *PCR* concludes that the primary purpose served by imposing liability for the explosion is to compensate victims:

> *Bal Harbor* . . . recognized that most tort liability, even liability for intentional discrimination, will serve both deterrent and compensatory goals.  The unique nature of intentional discrimination suggested that the primary purpose of imposing liability for such conduct was to serve the goal of deterrence.  We do not believe the same can be said for conduct subjecting an employer to liability under [the] objectively-substantially-certain standard.

889 So. 2d at 794-95 (internal citations omitted)

*PCR* confirms that, even if the insurance policy purported to cover Scott's felony battery, Florida's public policy would likely prevent coverage.  Unlike *PCR*,

- 14 -

which involved no deliberate intent to cause the explosion, Scott deliberately committed the battery, which "squarely implicate[s] the rule that one should not be able to insure against one's own intentional misconduct." *PCR*, 889 So. 2d at 794 (quoting *Bal Harbour*, 549 So. 2d at 1007); 12 Appleman & Appleman, *Insurance Law and Practice* § 7031 (1981).

Neither *CTC Development* nor *PCR* includes the deliberate commission of a violent felony or an intentional and forceful tort and neither *CTC Development* nor *PCR* upsets the established and sound principle preventing one from insuring against one's own felonious and tortious battery. Neither decision overturns or undermines the considerable and considered controlling precedent.

Finally, Scott's argument affronts common sense. Employing a two-ton pickup truck and pursuing drugs with an addict's pathetic but dominating urgency, Scott targeted and attacked Sarah and caused her catastrophic injury.[3] Whether Sarah Edwards would escape his attack without injury or whether Sarah would lie on the pavement gravely and forever injured, Scott intended to rob her of her money and buy his drugs.

A federal court deciding a substantive matter of state law must predict the decision of the state's highest court. Wright & Miller, 19 *Fed. Prac. & Proc.* § 4507 (2d

---

[3] Pleading guilty to felony battery in violation of Section 784.041, Florida Statutes, Scott admits (1) "actually and intentionally" touching or striking a victim against the victim's will and (2) "caus[ing] great bodily harm, permanent disability, or permanent disfigurement." *Florida Standard Jury Instructions in Criminal Cases* § 784.041 (2012). Pleading guilty to robbery in violation of Section 812.13(1) and 2(c), Florida Statutes, Scott admits "taking . . . property . . . with intent to either permanently or temporarily deprive the person or the owner of the . . . property . . . [by using] force, violence, assault, or [by] putting [the person] in fear."

ed. 2012).  Neither the policy language, nor public policy, nor precedent, nor prudence tolerates the notion that an "auto accident" includes Scott's criminal attack and that the result of an attack with a two-ton truck (or the operation of a "motor vehicle as a means to commit a robbery by sudden snatching") is not "intentional."

### CONCLUSION

NHIC's motion for summary judgment (Doc. 36) is **GRANTED**.  Sarah's guardian's and Scott's motions for summary judgment (Docs. 37 & 44) are **DENIED**. The trial motions (Docs. 77, 78, 79, 82, 83, 84, 85, 86, 87, 92, 93, 94) are **DENIED AS MOOT**.

ORDERED in Tampa, Florida, on December 13, 2012.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE